(73 Misc. Rep. 369.)

HOPPER v. BRITT et al., Board of Elections.

(Supreme Court, Special Term, New York County. September, 1911.)

1. ELECTIONS (§ 22*)—BALLOTS—CONSTITUTIONAL AND STATUTORY PROVISIONS —"NOMINATION."

The provision in Laws 1911, c. 649, amending Election Law (Consol. Laws 1909, c. 17) § 331, that the names of candidates chosen by more than one political party or independent body shall not appear more than once on the printed official ballot, discriminates against the political parties nominating a candidate also nominated by another party in whose column alone his name appears, and violates the Constitution, notwithstanding the definition in such amending law of the term "nomination," which limits the right of all parties to nominate candidates to a selection in accordance with the act, and so does not include the right to have the candidates' names appear on the official ballot in the column of a particular party.

[Ed. Note.—For other cases, see Elections, Cent. Dig. § 15;. Dec. Dig. § 22.*

For other definitions, see Words and Phrases, vol. 5, p. 4817.]

2. ELECTIONS (§ 22*)—"NOMINATE."

The term "nominate" means to designate by name, and not merely to refer to some place where the name can be found.

[Ed. Note.—For other cases, see Elections, Dec. Dig. § 22.*

For other definitions, see Words and Phrases, vol. 5, p. 4817.]

3. ELECTIONS (§ 22*)—BALLOTS—CONSTITUTIONAL AND STATUTORY PROVISIONS.

The provision of Laws 1911, c. 649, amending Election Law (Consol. Laws 1909, c. 17) § 331, that the names of candidates shall not appear more than once on the printed official ballot, impairs the constitutional rights of individual electors by depriving one voting for a multiple party candidate of the privilege of indicating his party principles, and compelling him to make more than one mark on his ticket in voting for all his party candidates, by excluding an illiterate voter from voting a straight ticket where the names of his party candidates are in different columns, and by depriving voters of ability to rely on the nomination by their party as a guaranty of the fitness of all the candidates.

[Ed. Note.—For other cases, see Elections, Cent. Dig. § 15; Dec. Dig. § 22.*]

4. WORDS AND PHRASES—"PRIVILEGE."

The accepted meaning of the term "privilege" is a "peculiar advantage."

[Ed. Note.—For other definitions, see Words and Phrases, vol. 6, pp. 5583–5589; vol. 8, p. 7764.]

Application by John J. Hopper for a peremptory writ of mandamus to J. Gabriel Britt and others, constituting the board of elections of the city of New York. Granted.

Order reversed 131 N. Y. Supp. 135.

Herbert R. Limburg (A. S. Gilbert, of counsel), for relator.
Archibald R. Watson, Corp. Counsel, for defendants.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

GAVEGAN, J: This application is made by the petitioner, a cit-
izen and elector of the county of New York, for a writ of manda-
mus directing the board of elections to disregard certain provisions
of chapter 649 of the Laws of 1911, amending the election law (Con-
sol. Laws 1909, c. 17), generally and especially with regard to the
method of preparing the ballot, and compelling that body to prepare
and print the official ballot to be used at the coming election in ac-
cordance with the provisions of section 331 of the election law as it
stood prior to its amendment by chapter 649 of the Laws of 1911.
The particular provision in question relates to the restriction that the
names of candidates named by more than one political party or in-
dependent body shall not appear more than once on the printed of-
ficial ballot. The law further changes the method of voting a straight
ticket, and the effect of a cross-mark in the circle at the head of a
column as follows: Under the old law the elector making a single
cross in the circle at the head of a column was thereby enabled to vote
for every candidate named by his party. Under the new law the
elector desiring to vote for a multiple candidate must make an addi-
tional cross-mark in the voting space before the name of each such
candidate nominated by his party or independent body, but appearing
only in a column of another party or independent body. A cross-
mark in the circle at the head of one column would, therefore, have
a totally different effect from a cross-mark in the circle at the head
of another column.

[1] The question to be determined is whether the Legislature has
the power to restrict the printing of a candidate's name to one party
column. There are involved in the question (1) the rights of candi-
dates of two or more parties; (2) the rights of political parties; and
(3) the rights of electors. I shall confine this discussion to the effect
of the law on the guaranteed rights and privileges of electors col-
lectively and individually, regarding it as premature to consider at
this time the effect of the law on the rights of candidates as such.
Where the Massachusetts ballot prevails—that is, where the party
columns have been abolished, and the names of candidates are grouped
under the title of the office, and a vote for each requires a separate
mark—there can be no injustice in providing that the name of the
candidate shall appear but once; but where the New York form of
ballot obtains and the political party is treated as a separate entity,
and the party column is retained, all parties must under our Consti-
tution be treated alike, and no party can be deprived of the privilege .
secured to any other party of having the names of its candidates ap-
pear in its party column. The right to merely nominate is empty and
ineffective, unless the act of a convention or of those nominating by
petition be followed by compliance with other provisions of the elec-
tion law and be reduced to the form of an official ballot to be sub-
mitted to the electors.

[2] The plain meaning of the term "nominate" is "to designate by
name"; that is, to "name," not merely to refer to some place where
the name can be found. Otherwise one party would have the right
to name, another party not the right to name, or, reduced to an ab-

surdity, one party would have the right to nominate and another party would have the right not to nominate. The so-called levy act grants to all political parties and independent bodies the right to nominate, but only to some political parties and independent bodies the right to name, substituting therefor the right to refer to some other column on the ballot wherein the name can be found. Under this act, a candidate nominated by two or more parties or independent bodies would have it within his power to destroy one or more of them and create political chaos. If a candidate for governor, for example, were nominated first by the Democratic party, then by the Prohibition party, as actually happened, within recent years in the case of a candidate for another state office, and chose to have his name printed only in the Prohibition party column, there would obviously be no votes for governor in the column of the Democratic party, which, under the law requiring 10,000 votes for governor to entitle it to a legal existence and official position, would mean its annihilation as a regular party organization. Plainly, a law which grants to each of two parties or bodies the right to nominate the same candidate and at the same time grants to the candidate the right to discriminate against one of those parties or bodies by preventing his name from appearing on its column is unequal and unfair in its operation. The very object of the election law, as declared in its original title, was to make independent voting easy, not difficult, and the courts of this state have always condemned statutes which make arbitrary distinctions in favor of one political class against another. The latest decision of the Court of Appeals is in Matter of Callahan; 200 N. Y. 60, 93 N. E. 262, 140 Am. St. Rep. 626, which declared invalid and unconstitutional a former provision of the election law preventing a committee of a party from nominating as its own candidate a candidate already in nomination by another party or body. The following are quotations from the opinion of Chief Judge Cullen in that case:

"If the Legislature does grant to any convention, committee, or body the right to make nominations, it cannot limit the right of such convention, committee or body to nominate as its candidate any person who is qualified for the office. * * * I insist that the Legislature has not the right to legislate so as to induce either partisan voting or independent voting. * * * The fact is plain that the legislative provision is solely intended to prevent political combinations and fusions, and this is the very thing that I insist there is no right to prevent or hamper as long as our theory of government prevails, that the source of all power is the people, as represented by the electors."

That decision is clear and controlling, and, were it not for the limitation sought to be placed on the meaning of the term "nomination" in one of the preliminary provisions of the levy act, under the heading "Definitions," not a single word of reasoning would be necessary to show its full application to the question raised here. The definition is as follows:

"The term 'nomination' means the *selection in accordance with the provisions of this chapter* of a candidate," etc.

Heretofore it has been generally understood that the right of a political party to nominate a candidate included the right to submit his

name to the electorate on its party column. Under this limited stat-
utory meaning, there would be no advantage lost to a single party
nominating its own candidates only, but there would be an obvious
disadvantage to multiple parties nominating the same candidates in
common.

[3] But, even if the question by this amendment in its relation
to the rights of political parties could be differentiated by legislative
refinement of definition from the rule laid down in the Matter of
Callahan, we are still able to consider the question in relation to the
rights of the individual elector under the terms of the Constitution
itself, which are so plain and unmistakable as not to be susceptible
of change by either legislative or judicial definition. This brings us
to the examination of the amendment with relation to the rights of
electors as individuals, which is the more important question. One
need not search very far into the Constitution for the provision which
it is claimed this amendment contravenes, for it is found at the very
opening thereof, and constitutes the foundation, as it were, upon
which rest all other rights secured and guaranteed to the citizens of
this state by its organic law. It reads as follows (article 1, § 1):

"No member of this state shall be disfranchised or deprived of any of the
rights or privileges secured to any citizen thereof unless by the law of the
land or the judgment of his peers."

The words "unless by the law of the land or the judgment of his
peers" may be disregarded as having no application to the present
controversy. An examination of the Constitutions of those states
whose courts have rendered decisions upon which the respondents
rely discloses no such provision. It may, therefore, very well be that
the Constitutions in those particular states are not violated, whereas
a similar provision would violate the Constitution of this state. In
any event, the reasoning of those decisions can be of but little value
here, since it is based upon premises other than those which must
be adopted by the courts of this state. I shall therefore leave to the
reviewing courts any extended discussion of those authorities. Even
the California case (Murphy v. Curry, 137 Cal. 479, 70 Pac. 461, 59
L. R. A. 97), cited by the petitioner, is not an authority in point,
since the provisions of the levy act fairly meet and overcome every
objection urged against the California statute, in the opinion of that
court. Indeed, the levy act was evidently drawn with great regard
for similar statutes in some states where they had been held to be
constitutional, and with great care to meet and overcome objections to
similar statutes pointed out by the courts of other states where they
had been declared unconstitutional, but with apparently no regard
for the plain provisions of the Constitution of this state. The more
important question, as I have said, is as to the rights of the electors
to vote for candidates. It is not a question of voting for the man,
but for the candidate; that is, in convention or nomination by peti-
tion, as the case may be, the man is voted for, but when nominated
he becomes the candidate, and, when the election takes place, it is the
candidate who is voted for. The elector voting for a multiple party
candidate is deprived of the privilege of indicating his party princi-

ples, which privilege is secured to the elector voting for a single party candidate, and this becomes essential when it is considered that our governmental policies are determined by choice of parties. When there is an absolute conflict between the platforms of two political parties, both of which have nominated the same candidate or candidates, as may well occur on the question of municipal ownership of subways and other public utilities, how is the elector whose party column does not contain the names of his candidates going to indicate his choice of platform or party principles? As governmental policies are to a large extent shaped by a prevailing party whose principles are indicated in its platform, the elector whose candidates are selected by his own and one or more additional parties should not be deprived of the free opportunity of indicating his choice of governmental policies by voting for all his candidates on a ticket which indicates his choice of party principles. Clearly this provision discriminates in favor of the citizen exercising his right of suffrage for a single party candidate against the citizen exercising his right of suffrage for a multiple party candidate.

[4] The accepted meaning of the term "privilege" is "a peculiar advantage." The so-called levy act secures to a member of a party or independent body all of whose candidates are named in his party column the peculiar advantage, in the sense that it is confined to his class, of being permitted to vote for his entire list of candidates by making one (✗) in the circle at the head of his party column, while it deprives the member of a party whose candidates are not named in his party column of the same advantage, and compels him, in voting for the entire list of his party candidates, to make an (✗) in the circle at the head of his party column and then another (✗) before the name of each of the candidates not contained in his party column, but appearing in some other party's column, after tracing the name of his candidate through a system of references and cross-references more fittingly associated with a railroad time-table than with the solemn record of an elector's suffrage. Nor must it be forgotten that if the act deprives one man who is typical of a class from a privilege secured to others of the same class it is unconstitutional. It is obvious that under this amendment the only way an illiterate voter can vote a straight ticket is by making an· (✗) in the circle at the top of a column which contains the names of all of his party candidates, which, of course, excludes illiterate voters from voting a straight ticket where the names of their party candidates are contained in different columns. Here we are confronted with an increase in the qualifications of a voter who is typical of a class, which is an additional argument against the validity of the act. Who will say that it is not an advantage both to illiterate and literate voters, many of whom may prefer to accept their party's nomination of a candidate as a complete guaranty of his fitness, being unable for many reasons themselves to investigate such fitness, to be permitted to vote their straight party ticket by making one (✗) in the circle under their party emblem? And yet the Legislature would take from electors voting for multiple candidates this advantage, which under the old law was

given to all electors, and make it a peculiar advantage; that is, give a monopoly of it to a limited privileged class of electors. Instances might be multiplied illustrating the unequal operation of this act and its unjust discrimination against electors voting for multiple party candidates. Suffice it to say that the right of suffrage and the privilege of exercising it without let or hindrance under the same conditions and terms secured to other citizens is guaranteed by article 1, § 1, of the Constitution to every elector of this state. Section 331 of the election laws of 1911 deprives the petitioner and other electors of that privilege, and is therefore invalid and unconstitutional. With regard to respondents' contention that there is no real controversy before the court which it has power to decide at this time, it seems to me it might as well be argued that this court had no power to pass upon the constitutionality of a legislative act which in terms disfranchises one-half of the citizens. To refuse to entertain the application until after the ballots were printed might effectually prevents its ever being of any avail. Morris v. Wrightson, 56 N. J. Law, 126, 28 Atl. 56, 22 L. R. A. 548. Finally it is well established that, where the duty the performance of which is sought to be compelled is a public duty, a writ of mandamus will be issued without consideration of prior demand and refusal. People ex rel. O'Brien v. Cruger, 12 App. Div. 536, 42 N. Y. Supp. 398, and authorities therein cited. The question is an important one, and ought to be settled before the time arrives for the printing of the ballots for the ensuing general election. I would, therefore, suggest that an appeal from the order to be entered hereon be immediately taken and diligently prosecuted, either by one of the parties to this proceeding or by an elector, who will be permitted to intervene for that purpose.

Application granted.